REEVE vs. THOMPSON, MISC 17-000438

































 
 ABBOTT L. REEVE and J. STANLEY REEVE, as Trustees of Folly Hill Associates Trust, Plaintiffs, v. JOHN THOMPSON, ELLEN HUTCHINSON, CATHERINE BARRETT, EDWIN BARRETT III, ALEXANDER CRAFT, ELLEN FLANNERY, DAVID MACK, JAMES MATZ, and WAYNE MILLER, as Members of the Planning Board of the City of Beverly, Defendants
 MISC 17-000438 
 MAY 20, 2021
ESSEX, ss.
VHAY, J.
DECISION














 Plaintiffs Abbott L. Reeve and J. Stanley Reeve (the "Trustees") are the trustees of the Folly Hill Associates Trust. The Trust owns a 76.6-acre property in Beverly, Massachusetts (the "Property"). The Property lies within the City of Beverly's RSD-Special Residential district (the "RSD District"). 





 In 1981, pursuant to G.L. c. 41, § 81K et seq. (the "Subdivision Control Law'), the Trustees applied to the Beverly Planning Board for approval of a definitive subdivision plan (the "1981 Plan"). The Board approved that plan. It showed a division of the Property into three large lots.





 Nearly 35 years later, in September 2016, the Trustees applied to the defendant members of the Planning Board for approval of another (albeit preliminary) subdivision plan for the Property. The Board voted to take no action on the plan. On March 2017, the Trustees asked the Board to approve a new definitive subdivision plan (the "2017 Plan"). The 2017 Plan eliminated some of the roads and cul-de-sacs depicted on the 1981 Plan. The 2017 Plan also reconfigured the 1981 Plan's three lots into two lots, now called Lots A and B. Lot A was proposed to have 14.467 acres, and Lot B was proposed to have 66.221 acres. The parties agree that the Trustees' objective in filing their preliminary and definitive subdivision plans in 2016-2017 was to "freeze" for a time the zoning laws applicable to the Property, see G.L. c. 40A, § 6, but the Trustees' motives have no bearing on this Decision. 





 In May 2017, the Planning Board opened its public hearings on the Trustees' 2017 subdivision application (the "Application"). In the Application, the Trustees sought four waivers from the Board's Subdivision Regulations, City Code of Beverly Chapter 375 (the "Regulations"). The requested waivers were from Regulations requiring that a definitive subdivision plan show (1) all trees 6" in caliper, as the Trustees claimed "the site is heavily wooded"; (2) street addresses, as the Trustees admitted that they had "not yet determined" where they would be constructing buildings; (3) survey benchmarks, as the Trustees had established "the topography . . . by aerial survey"; and (4) water table information, as the Trustees hadn't determined the water table. [Note 1] By the time the Board had concluded its public hearings, however, the list of requested waivers had grown to nineteen. The Board identified all nineteen in a July 2017 decision, following a 5-3 vote, approving the 2017 Plan (the "Board's Decision"): 





 1. Section 375-13B(15) - Waiver requested for providing soil logs and estimated seasonal high water as the plan does not anticipate the creation of ways in a new location, and the ways in this location were approved in the 1982 . . . Plan. 





 2. Section 375-13B(17) - Waiver requested to not provide stormwater management calculations as it is anticipated that stormwater management will be handled during the Site Plan Review[ [Note 2]] and Conservation process.[ [Note 3]] As indicated, the [1982] Plan was previously approved. 





 3. Section 375-13B(19) - Waiver requested to not show proposed trees as a Landscape Plan will be required for any multi-family development proposed on the property. 





 4. Section 375-13B(20) - Waiver is requested to not provide soil conditions and high groundwater [level] as the roadway in this location was already approved [in the 1982 Plan]. 





 5. Section 375-13B(21) - Waiver is requested to not provide street lights or sidewalks, etc., as they were not provided in the [1982] Plan approval and are not consistent with the subdivision concept. 





 6. Section 375-13F - Waiver is requested to not provide soil survey and percolation testing as the roadway has already been approved in this location. 





 7. Section 375-14B(3) -Waiver is requested to not include tangents between reverse curves as the roadway was previously laid out not including this feature. 





 8. Section 375-16 - Waiver is requested not to provide curb cut information at this time as no definitive site plans have yet been developed for the continued development. 





 9. Section 375-13B(2) - Benchmark shown on the plan. According to June 22, 2017 letter [from the Trustees' engineer], benchmarks will not be shown on the revised plan. 





 10. Section 375-13B(5) & (6) - Bearings and boundary lines of all easements. According to June 22, 2017 letter, bearings and distances of existing easements are not anticipated to be shown on plan. 





 11. Section 375-13B(13) - Street address numbers for each lot on a definitive subdivision plan. 





 12. Section 375-13B(14) - Notation that, "should the rodent population"[ [Note 4]] 





 13. Section 375-13B(15) - At least two bench marks are to be shown on plans and profiles. 





 14. Section 375-13B(16) - Existing and proposed topography at two-foot contour intervals and, by symbols, the highest known high water mark. Topography was completed aerially rather than on-the-ground. (See request above for waiver re: high water). 





 15. Section 375-13B(18) - Calculations by a registered engineer to substantiate proposed drain pipe sizes. See waiver request [#2] above. 





 16. Section 375-13B(23) - Necessary engineering calculations to provide information that . . . fire protection, vehicular traffic flow, utilities, and all other safety precautions are being provided. [Ellipses in original.] 





 17. Section 375-13B(24) - Overall drainage plan shall be submitted as part of the definitive plans. According to June 22, 2017 letter, drainage plan was not submitted as no drainage study was done. Will be required of a future submittal. 





 18. Section 375-14D(2) -- Maximum center-line grade of 6%. While the previous plan included a grade exceeding 6%; the applicant requested a new subdivision, not a modification[,] therefore a new waiver is required. 





 19. Section 375-20 - Lot drainage has not been provided for review. See comment above under [waiver request #17]. 





 The Board's Decision also recites twelve conditions the Board imposed on its approval of the 2017 Plan. In this action, which the Trustees filed pursuant to c. 41, § 81BB, the Trustees challenge nine of those conditions. The contested conditions are: 





 Condition No. 1: "That pursuant to Section 375-6 of the . . . Regulations, to the extent applicable, any future development of the site greater than one residential building shall require the submission of a modification of [the 2017 Plan] to the Planning Board to address the adequacy of access to the lot(s), a plan for sufficient utilities, roadway alignment, and to update potential traffic impacts, among other elements as required by Section 375-13.B(23) of the . . . Regulations, as they relate to a proposed future development." 





 Condition No. 4: "That an approval of [the 2017 Plan] does not preclude the requirement of sidewalks from any future development plan." 





 Condition No. 6: "That prior to any construction on the site, including the roadway with permitting, the project applicant, including any future applicants, shall submit an application to the Conservation Commission for an Abbreviated Notice of Resource Area Delineation . . . and an Order of Conditions for any proposed work subject to the Wetlands Protection Act and [the] Beverly Wetlands Ordinance. Any changes to the project plans following the Conservation Commission process that affect[] the roadway configuration shall be submitted to the Planning Board for review and approval of a new Definitive Subdivision Plan." 





 Condition No. 7: "That the project applicant of a future development shall demonstrate that there is adequate sewer and water infrastructure, consistent with [the] Regulations, to serve the proposed development. Upgrades necessary to provide adequate sewer and water infrastructure within the proposed site as determined by the Planning Board shall be made at the applicant's expense." 





 Condition No. 8: "That prior to any future development . . . greater than one residential building, the project applicant, including future applicants, shall submit a stormwater management plan and calculations consistent with [the] Massachusetts Stormwater Handbook in connection with a modification of [the 2017 Plan] to the Planning Board; the board reserves the right to require soil borings, percolation testing, and analysis of estimates of high water as part of the stormwater analysis." 





 Condition No. 9: "That an approval of [the 2017 Plan] does not preclude the requirement of sidewalks, street trees, or other landscape elements, from any future development plan; the project applicant may propose a comprehensive landscape plan that demonstrates the street trees and other required elements are provided consistent with [the] Regulations." 





 Condition No. 10: "That all ways and utilities shall be completed within two years of the date of approval, per Section 375-13A(2), and if not met, a new application shall be required." 





 Condition No. 11: "That the Planning [Board] retain[s] jurisdiction to evaluate, in the context of the proposed future development of the site, any waivers granted herein." 





 Condition No. 12: "That the applicant of a future proposed development submit a modified plan and a list of the requested waivers for the consideration of the Planning Board in the context of the proposed plans." 





The Board's Decision says this about the waivers and the conditions: 





 [T]he Board considered the requested waivers from the [Regulations] as well as those reflected in the [June 22, 2017 letter]. The Board found that the conditions enumerated below would ensure the proposed definitive subdivision plan would not be inconsistent with the purpose and intent of the Subdivision Control Law and the . . . Regulations. 





 The parties have cross-moved for summary judgment on the question of whether the Board had the power to impose the challenged conditions. The facts set forth above are undisputed. 





 A party who challenges conditions imposed by a planning board upon its approval of a definitive subdivision plan bears the burden of proving that the board exceeded its authority. See Miles v. Planning Bd. of Millbury, 404 Mass. 489 , 490-491 (1989). The Trustees' chief attack on the Board's conditions is simple: under Massachusetts law, a municipal board "may not delegate to another board, or reserve tor itself for future decision, the determination of an issue of substance, i.e, one central to the matter before the [board]." Tebo v. Board of Appeals of Shrewsbury, 22 Mass. App. Ct. 618 , 624 (1986). See also Miles v. Planning Bd. of Millbury, 29 Mass. App. Ct. 951 , 952 (1990) (rescript) (applying Tebo principles to conditions of approvals, under the Subdivision Control Law, of definitive subdivision plans); Adams v. Planning Bd. of Westwood, 64 Mass. App. Ct. 383 , 392-393 (2005) (same). [Note 5] A board may defer something to "future decision" only if the board's original decision contains "cognizable and reasonably definite standard[s]" for future application, such that "there has been no postponement of the adoption of a standard or criterion" applicable to the approved subdivision. Miles, 29 Mass. App. Ct. at 952. 





 Before turning to the Planning Board's response to the Trustees' argument, it's clear that one of the contested conditions, Condition No. 10, doesn't delegate any action to another board or reserve to the Board any later decision. Condition No. 10 states simply: "[A]ll ways and utilities shall be completed within two years of the date of approval, per Section 375-13A(2), and if not met, a new application shall be required." That's essentially what § 375-13A(2) of the Regulations mandates. [Note 6] The Subdivision Control Law permits planning boards to impose reasonable deadlines for a developer to install subdivision infrastructure. See Costanza & Bertolino, Inc. v. Planning Bd. of No. Reading, 360 Mass. 677 , 680 (1971). While the Law expressly permits planning boards to include such deadlines in the mechanisms set forth in c. 41, § 81U, for securing a developer's infrastructure-construction obligations, see Costanza, 360 Mass. at 680-681, including such requirements in a municipality's subdivision regulations equally serves the Law's purpose of assuring the construction and provision of necessary ways and services. See id. The Board's imposition, via Condition No. 10, of a two-year construction deadline pursuant to § 375-13A(2) of the Regulations was thus lawful. 





 The Court now returns to the Trustees' Tebo/Adams argument. The Planning Board admits that many of the remaining contested conditions defer for later decision various aspects of development of the Trustees' Property. The Board argues those conditions are a legitimate byproduct of the Trustees' nineteen requested plan and application waivers. The Board submits that a subdivision application that requires so many waivers forces a board either to deny the application or approve it subject to later resolution of whatever open issues the non-complying application presents. The Board claims it acted within its discretion in choosing the second option here. 





 Caselaw surrounding a planning board's powers to waive subdivision regulations offers rhetorical support for the Board's position. Section 81R of the Subdivision Control Law allows boards to grant waivers "where such action is in the public interest and not inconsistent with the intent and purpose of the subdivision control law." G.L. c. 41, § 81R. [Note 7] A board's decision to grant or deny a waiver "will be upheld unless premised upon 'a legally untenable ground, or is unreasonable, whimsical, capricious or arbitrary.'" Krafchuk v. Planning Bd. of Ipswich, 453 Mass. 517 , 529 (2009), quoting Musto v. Planning Bd. of Medfield, 54 Mass. App. Ct. 831 , 837 (2002). Krafchuk also suggests that boards have considerable discretion in granting waivers: 





 The board's determination whether a particular waiver is in "the public interest" involves a large measure of discretion, and if "reasonable minds might in good faith differ, without doubting the reasonableness of the opposing view, the conclusion reached by the planning board should be sustained on judicial review. For it is the board, not the court, to whom the statute delegates the discretion, and the role of the court is merely to ascertain whether the board exceeded its authority." 





Krafchuk, 453 Mass. at 529 (citations omitted), quoting Arrigo v. Planning Bd. of Franklin, 12 Mass. App. Ct. 802 , 809 (1981). 





 But Krafchuk doesn't hold that planning boards get a free pass when granting waivers. In Krafchuk itself, the Superior Court held a trial concerning the validity of two waivers. Based on the facts found at trial, the Supreme Judicial Court was able to determine that each waiver, as conditioned by the board, would "provide substantially the same level of safety and convenience to the public as would strict adherence to the board's own rules and regulations. . . ." Having made that determination, the Supreme Judicial Court held that the board had not exceeded its authority in concluding that the waivers as conditioned were in the public interest. Krafchuk, 453 Mass. at 531-532. 





 A planning board's grant of a waiver faces even greater scrutiny when it comes to § 81R's second requirement for a valid waiver, that the waiver be "not inconsistent" with the intent and purpose of the Subdivision Control Law. A reviewing court needn't show any deference to the board's determination of that issue. See Krafchuk, 453 Mass. at 529 (emphasis added; "the court determines whether there is substantial derogation from the intent and purpose of the subdivision control law"). Collings v. Planning Bd. of Stow, 79 Mass. App. Ct. 447 , 453 (2011), further holds that, in granting waivers under § 81R, a planning board may not impose conditions that themselves are "inconsistent with the intent and purpose of the subdivision control law." 





 Against these principles, the Planning Board's defense of the contested conditions is problematic. First, the Board has only argued that it imposed the conditions to make sure its waivers were in the public interest. The Board hasn't offered admissible evidence of that linkage. The Board's Decision (which has no evidentiary value other than as to its result, see, for example, Josephs v. Board of Appeals of Brookline, 362 Mass. 290 , 295 (1972)) doesn't squarely make the connection either. The Decision states only that the Board "considered the requested waivers," then "found that the conditions enumerated below would ensure the proposed definitive subdivision plan would not be inconsistent with the purpose and intent of the Subdivision Control Law and the . . . Regulations. . . ." The Decision doesn't say the Board imposed the conditions because it granted waivers. (One could read the requirement in the first sentence of Condition No. 6, for example, as merely an effort to accommodate another board. That requirement has no obvious tie to any waiver.) Massachusetts courts also disfavor calling board members to trial to explain their thought processes after the fact. [Note 8]





 The Court thus can't conclude, on the record the Planning Board presents at summary judgment, that the Board's waivers justified some (or all) of the contested conditions, or that the contested conditions were critical to making some (or all) of the waivers consistent with the public interest. See Czyoski v. Planning Bd. of Truro, 77 Mass. App. Ct. 151 , 157 (2010) (once property owners provided on summary judgment evidence that challenged a planning board's modification decision, "the board needed to counter such affidavits in order to dispute the owners' portrayal of the facts" in order to defeat the owners' motion). But even if the record established a link between specific waivers and particular contested conditions, the conditions themselves contravene Tebo and Adams. In Adams, a planning board conditioned its approval of a subdivision on the developer submitting to the board, for its review and approval in consultation with the town engineer, "the design, location, and construction of any retaining walls and [any] drainage system[s]. . . ." Adams, 64 Mass. App. Ct. at 392-393 & n. 20. The Adams court called those details "issues of substance" for the subdivision approval. Id. at 393. The court thus upheld this Court's (Lombardi, J.) annulment of the approval, on the grounds that it included an improper condition. Id. at 393 & n. 21. 





 As written, Conditions Nos. 1, 4, 6-9, and 11-12 leave for future decision (in what the Board otherwise claims is an "approved" subdivision) numerous details pertaining to access, utilities, roads, sidewalks, sewer and water infrastructure, drainage, street trees, and landscaping. Deferring to later the approval of such critical details violates Tebo and Adams. Deferral also is inconsistent with the purposes of the Subdivision Control Law. The Legislature enacted the Law "for the purpose of protecting the safety, convenience and welfare of the inhabitants of the cities and towns in which it is, or may hereafter be, put in effect. . . ." G.L. c. 41, § 81M. The Law achieves those purposes, however, by requiring municipalities that adopt the Law to enact subdivision regulations that are "comprehensive, reasonably definite, and carefully drafted, so that owners may know in advance what is or may be required of them and what standards and procedures will be applied to them. . . ." Castle Estates, Inc. v. Park & Planning Bd. of Medfield, 344 Mass. 329 , 334 (1962) (emphasis added). If a definitive subdivision plan complies with those rules, and conforms to the board of health's recommendations, the planning board must approve the subdivision. See c. 41, § 81M; Pieper v. Planning Bd. of Southborough, 340 Mass. 157 , 163 (1959). If the definitive plan doesn't comply with the rules, the board may deny the subdivision application. See Nahigian v. Town of Lexington, 32 Mass. App. Ct. 517 , 522 (1992). The Law envisions that everyone - the planning board, the developer, and the public - will know at the conclusion of the process outlined in the Law, and not at some future, yet-to-be-determined date, whether the board thinks the developer's subdivision plan meets the board's requirements. Those who disagree with the board can then appeal, in accordance with c. 41, § 81BB. 





 The Board attempts to rescue three contested conditions, Nos. 1, 6 and 11, by arguing that, like legitimate Condition No. 10, they merely "codify" parts of the Regulations. The Court disagrees: 





 - The Board contends that Condition No. 1 mirrors § 375-6 of the Regulations. Section 375-6 provides that "[n]ot more than one building designed or available for use for dwelling purposes shall be erected . . . on any lots in a subdivision . . . without the consent of the Beverly Planning Board. Such consent may be conditional upon the providing of adequate ways furnishing access to each site for such building in the same manner as otherwise required for lots within a subdivision." [Note 9] The trouble with the Board's argument is that § 375-6 allows the Board to condition its approval of second and subsequent buildings only on the provision of "adequate ways furnishing access" to those buildings. Condition No. 1 goes beyond, requiring "submission of a modification of [the 2017 Plan]" to address "sufficient utilities, roadway alignment," and whatever Condition No. 1 means by "updat[ing] potential traffic impacts . . . as they relate to a proposed future development" (whatever that latter phrase means). 





 - The Board says that the second sentence of Condition No. 6 ("Any changes to the project plans following the Conservation Commission process that affect[] the roadway configuration shall be submitted to the Planning Board for review and approval of a new Definitive Subdivision Plan.") follows from § 375-43 of the Regulations. [Note 10] The trouble with Condition No. 6, however, lies in its first sentence, which requires the Trustees to apply to another board, the Conservation Commission, for review of any work on the Property that's within the Commission's jurisdiction, prior to the Trustees doing any work anywhere on the Property -- even areas that are outside the Commission's jurisdiction. 





 - The Board submits that Condition No. 11 ("[T]he Planning [Board] retain[s] jurisdiction to evaluate, in the context of the proposed future development of the site, any waivers granted herein.") simply reiterates c. 41, § 81W. Section 81W doesn't give planning boards powers ranging powers to "evaluate" (Condition No. 11's word) previously granted waivers "in the context of the proposed future development" (again, Condition No. 11's phrase). Instead, § 81W allows a planning board, "on its own motion[,] to modify, amend or rescind its approval of a plan of a subdivision, or to require a change in a plan as a condition of its retaining the status of an approved plan." Section 81W also restricts how a board may exercise those powers. Condition No. 11 contains no such restrictions. [Note 11] 





 The Court thus holds that the Board's Decision is invalid, as Conditions Nos. 1, 4, 6-9, and 11-12 improperly defer for later decision matters that are central to the Board's review of the Application. The Trustees say that the proper remedy is for the Court to strike those conditions and let the rest of the Board's Decision stand. Cases suggest that a court can't (or shouldn't) do that. Strand holds that c. 41, § 81BB, does not give a court "the power to order modifications of a plan as conditions of [the court's] approval of the plan. Any change of this sort should be analyzed and approved . . . by a planning board," which is "better equipped than a court to analyze the relevant data." Strand, 5 Mass. App. Ct. at 22-23. That reasoning applies equally to modification (or elimination) of conditions a board has placed on its approval of a plan. Remanding to the planning board a defective plan approval gives the public and interested agencies the ability to weigh in on any modified plan, at a public hearing, and allows the board to determine in the first instance whether the plan and any new proposed conditions (stripped of whatever infirmities the court found in the board's original decision) conform to the board's subdivision regulations. See id. at 23-24; see also Adams, 64 Mass. App. Ct. at 393 & n. 21 (court's determination that a subdivision approval improperly reserves "for future determination an issue of substance . . . that the approval be annulled") (emphasis added). 





 Strand's directive is particularly pertinent here. It's undisputed that the 2017 Plan didn't meet the Regulations in at least nineteen ways. The record suggests the Board imposed some or all of the invalid conditions to ameliorate what it saw as the 2017 Plan's shortcomings. The Board shouldn't have done that, but it's within the Board's prerogative on remand to press the Trustees for a complying definitive plan, grant waivers (even with conditions, so long as they don't defer important decisions), or deny approval altogether of a non-complying plan. See Nahigian, 32 Mass. App. Ct. 517 at 522 (1992) (board may deny approval of a plan that fails to comply with clearly expressed subdivision regulations); Miles, 404 Mass. at 490 n. 4 (subdivision applicant is not entitled to waivers of subdivision regulations). 





 The Court will thus VACATE the Board's Decision in its entirety and REMAND this case to the Board for further proceedings. Judgment to enter accordingly. 





FOOTNOTES
[Note 1] These requests appear in the Trustees' Appendix of Summary Judgment Exhibits at page 110. The requests list specific Regulations the Trustees wanted waived, but the numbers that appear on page 110 don't correspond to those found in the actual Regulations. 

[Note 2] The parties agree that because the Board approved the 2017 Plan, the zoning ordinance that currently applies to the Property is the September 2016 version (the "Ordinance"). Section 38-15.D.14 of the Ordinance requires site-plan approval (conducted by the Planning Board) for all developments in the RSD District. A site plan must include "the location, length, and layout of proposed buildings, structures, roads, parking areas, recreational facilities, utilities and other improvements. . . ." 

[Note 3] The Commonwealth's Wetlands Protection Act, G.L. c. 131, § 40, and the Beverly Wetlands Ordinance give the Beverly Conservation Commission jurisdiction over certain activities conducted in wetlands on the Property, as well as in buffer zones associated with those wetlands. 

[Note 4] Ellipses in original. Section 375-13B(14) states in full that a definitive subdivision plan must contain a notation that, "Should the rodent population be displaced (leave its natural habitat) because of land development, then the developer must bear the responsibility of retaining the services of a professional exterminating company to abate the rodent migration problem. This service must adequately solve the problem and must be completed at the expense of the developer." One wonders what Pied Piper-like catastrophe triggered adoption of this Regulation. 

[Note 5] On page 10 of their memorandum in support of their motion for summary judgment, the Trustees also ask the Court to order the Board to conduct site plan review. See note 2 above. The Trustees admitted at oral argument that they hadn't applied to the Board for site-plan review, and they've not directed the Court to any statute that gives courts the power to order site-plan review prior to someone applying to a local board for such review. The Court thus DENIES the Trustees' request for an order directing the Board to conduct site-plan review in the absence of an application. 

[Note 6] Section 375-13A(2) provides: 



 Approval of all plans shall be upon the condition that all ways shown thereon and all public utilities required by the Board shall be completed and installed within the time so specified. The Board may decline to approve any plan unless the applicant agrees to complete the ways . . . and install the public utilities . . . within two years of the date of approval. If the ways . . . are not completed and the utilities . . . are not installed within the time so agreed to by the applicant or so required by the Board, no such way shall thereafter be laid out, constructed, completed or opened for public use unless and until a new application is filed with and approved by the Board. Ways or portions thereof not completed within two years from the date of approval by the Board shall thereafter be completed in accordance with the then-in-force construction standards of the Beverly Planning Board.



[Note 7] The Regulations do not add to § 81R's requirements. See Regulations, § 375-1 (allowing waivers "as provided for in MGL c. 41, § 81R"); id. at § 375-37 (allowing waivers "when, in the judgment of the Beverly Planning Board, such action is in the public interest and not inconsistent with the Subdivision Control Law"). 

[Note 8] See New England Med. Center, Inc. v. Rate Setting Comm'n, 384 Mass. 46 , 55-56 (1981) (inquiry into mental processes of administrative decision makers appropriate only if agency hasn't made findings at the time of its decision or in "extraordinary circumstances where there is a strong showing of improper behavior or bad faith on the part of the administrator"); Clear Channel Outdoor, Inc. v. Zoning Bd. of Appeals of Salisbury, 94 Mass. App. Ct. 594 , 599-600 (2018) (assuming, but not deciding, that New England Med. applies to board members' decision to grant special permit under G.L. c. 40A, § 9). 

[Note 9] See also c. 41, § 81Q (subdivision regulations "may . . . provide that not more than one building designed or available for use for dwelling purposes shall be erected . . . on any lot in a subdivision . . . without the consent of the planning board, and that such consent may be conditional upon the providing of adequate ways furnishing access to each site for such building, in the same manner as otherwise required for lots within a subdivision"). 

[Note 10] Section 375-43 provides in part: "No changes, alternations, or modifications shall be made to any aspect of an approved definitive plan without resubmission to and approval from the Planning Board in accordance with [the Subdivision Control Law]." See also c. 41, § 81O (after approval of a definitive subdivision plan, "the location and width of ways shown thereon shall not be changed unless the plan is amended accordingly as provided in section eighty-one W; but the number, shape and size of the lots shown on a plan so approved may, from time to time, be changed without action by the board, provided every lot so changed still has frontage on a public way or way shown on a plan approved in accordance with the subdivision control law of at least such distance, if any, as is then required by ordinance . . . of said city . . . for erection of a building on such lot, and if no distance is so required, has such frontage of at least twenty feet"). 

[Note 11] There are at least three limits on a planning board's § 81W powers. First, boards seeking to exercise those powers must follow the same process required for an original plan approval. See id. at § 81T; Young v. Planning Bd. of Chilmark, 402 Mass. 841 , 844 (1988); Strand v. Planning Bd. of Sudbury, 5 Mass. App. Ct. 18 , 23 (1977). Second, a board "may not rescind its approval of a definitive plan . . . unless there is 'good reason' to do so." Czyoski, 77 Mass. App. Ct. at 157, quoting Young, 402 Mass. at 846. Finally, § 81W expressly provides that "[n]o modification, amendment or recission of . . . approval . . . shall affect the lots in such subdivision which have been sold or mortgaged in good faith and for a valuable consideration subsequent to the approval of the plan, or any rights appurtenant thereto," without the consent of the owner and anyone holding such a mortgage. 


 
 Home/Search 
 Land Cases by Docket Number
 Land Cases by Date 
 Land Cases by Name
 


 Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.